52 So.2d 105 (1951)
RADER
v.
STATE.
Supreme Court of Florida, en Banc.
April 17, 1951.
C.D. Blackwell, J.H. Lesser, E.M. Baynes and Baynes, Garman & Phillips, all of West Palm Beach, Sydney L. Weintraub, Miami, and Watkins & Cohen, Tallahassee, for appellant.
Richard W. Ervin, Atty. Gen. and Reeves Bowen, Asst. Atty. Gen., for appellee.
CHAPMAN, Justice.
On April 13, 1949, the County Solicitor of Palm Beach County, Florida, filed in the Criminal Court of Record an information consisting of ten counts against Leo J. Rader charging him with the crime of perjury. Count Ten was quashed by an order of the Court and the defendant-appellant went to trial before a jury on Counts One to Nine, inclusive, which resulted in a verdict of guilty on each Count from One to Nine, inclusive. The trial Court adjudged Rader guilty of the crime of perjury under each of the nine counts and imposed a sentence of three years at hard labor in the State Prison under each of the nine counts of the information. The nine sentences so entered were by an appropriate order of the trial Court made to run concurrently.
The perjury prosecution stems from the following factual situation: Prior to 1928 Bessie Multach was a widow and the mother of two small children, Al Multach and Mary Multach, who several years later married a Mr. Sontz and resided in Chicago. Leo J. Rader and Bessie Multach married in 1928 and lived together as husband and wife in different sections of the lower East Coast until Bessie Rader died on November 15, 1947. Leo Rader and wife Bessie acquired and owned real and personal property jointly. They maintained a joint bank account and kept their property in the same box at the bank. It appears that they were congenial and trusted each other in business matters without any friction. The daughter, Mary Multach Sontz, lived in Chicago after marriage, but returned to the Palm Beach area to live a few months prior to her mother's death. Mary Sontz and her stepfather together frequently visited the mother and wife at the hospital prior to her death in November, 1947. According to the record, no family strife, bitterness or hostility existed between the two stepchildren and Leo Rader until Leo Rader remarried in the early part of 1948, a short time after the death of the first wife.
The First National Bank of Palm Beach was made executor of the estate of Bessie *106 Rader, deceased, and on August 10, 1948, filed a suit in trover in the Circuit Court of Palm Beach County against Leo Rader to recover the value of bonds in the sum of $5,000.00 property of the Bessie Rader estate. This suit resulted in a verdict and judgment in behalf of the Bessie Rader estate in the sum of $5,000.00. On appeal here the judgment entered below was affirmed. See Rader v. First National Bank of Palm Beach, Fla., 42 So.2d 1.
A certified copy of a final decree entered in the Circuit Court of Palm Beach County dated March 9, 1950, wherein the First National Bank of Palm Beach, as Executor of the Estate of Bessie Rader, deceased, was plaintiff and Leo J. Rader and Rader Properties, a corporation, were defendants, has been file marked in this criminal case by the Clerk of this Court. Counsel for appellant, in their brief and in oral argument heard at the bar of this Court, referred to the final decree, supra, as entered by Judge Chillingworth. The Assistant Attorney General makes the point that the final decree, supra, is not lawfully before this Court, and an order entered here allowing the same to be filed and considered as a part of the record in the criminal case has not been brought to our attention.
On February 15th, 1944, Leo J. Rader and wife, Bessie Rader, each subscribed and signed written orders for $5,000.00 of Government Bonds through the officers of the First National Bank of Palm Beach, Florida. Copy of their written orders are viz.:
 "First National Bank
 in Palm Beach, Palm
 Beach, Florida (Exhibit No. 3)
 Gentlemen:
Please enter my/our subscription for:
$ ________ U.S. Treasury 7/8% C/Is,
 Series A-1945
$ ________ U.S. Treasury 21/4% Bonds
 of 1956-59
$ 5000 U.S. Treasury 21/2% Bonds
 of 1965-70
$ ________ U.S. Treasury Savings Notes,
 Series C
You are authorized to charge my/our account for the principal and accrued interest on these bonds when the subscription is entered.
 "Very truly yours,
 Leo J. Rader"
"First National Bank
in Palm Beach, Palm
Beach, Florida (Exhibit No. 4)
Gentlemen:
Please enter my/our subscription for:
$ ________ U.S. Treasury 7/8% C/Is,
 Series A-1945
$ ________ U.S. Treasury 21/4% Bonds
 of 1956-59
$ 5000 U.S. Treasury 21/2% Bonds
 of 1965-70
$________ U.S. Treasury Savings Notes,
 Series C
You are authorized to charge my/our account for the principal and accrued interest on these bonds when the subscription is entered.
 "Very truly yours,
 Bessie Rader"
Some three or four days after the Bank received or obtained the written orders of Leo J. Rader and Bessie Rader for the bonds in the sum of $10,000.00 at the Bank at Palm Beach, a letter was written by the Bank to Mr. Rader, viz.:
 "February 19, 1944
 "Mr. Leo J. Rader
 Belle Glade
 Florida
"Dear Mr. Rader:
"Your account was not sufficient to meet your check for $9,000.00 given in payment of the 2 1/2% U.S. Government Bonds. Your balance was $8,675.00. However, we have paid the check and are holding the difference of $325.00 as a cash item.
"We suggest that you forward us, by mail, a check to cover the overdraft.
 "Very truly yours,
 "H. G. Stenersen
 "Vice-President"
The Bank charged the joint account of Leo J. Rader and Bessie Rader with the bonds and the account at the time was insufficient in amount to pay for the same Rader made a note payable to the Bank in the sum of $1,000.00 and left the bonds with the Bank as security for the loan. *107 Mr. Rader later paid his note as held by the Bank and upon payment thereof the Bank delivered to him the $10,000.00 worth of Government Bonds held by it as security for the payment of his note. It is not disputed that Rader thereafter took these bonds and placed them in a box jointly kept by him and his wife, Bessie Rader. Bessie Rader during her lifetime had access to the lock box the same as her husband.
On February 14, 1946, Leo J. Rader used the $10,000.00 in Government Bonds as collateral to secure the payment of a note made payable to the Bank of Pahokee in the sum of $10,000.00, and signed by Leo J. Rader and Leonard W. Alper. The loan was obtained as an accommodation for L.W. Alper, a nephew of Leo J. Rader. These bonds in the sum of $10,000.00 were later sold through a New York bank and the note of Rader and Alper previously given to the bank was paid in full under date of November 28, 1947, some few days after the death of Bessie Rader. The judgment in trover was obtained by the bank-executor against Rader for the interest in the bonds of Bessie Rader as used by her husband, Leo J. Rader.
The First National Bank of Palm Beach was made executor of the Estate of Bessie Rader, deceased, and the daughter, Mary Sontz, was one of the beneficiaries under the will. Leo J. Rader and wife, Bessie Rader, acquired considerable property after their marriage in 1928 and prior to her death on November 15,1947. Mary Sontz and brother, Al Multach, were each financially interested in the litigation brought against Leo J. Rader. Mary Sontz gave important testimony in the trover and conversion suit brought against her stepfather. The perjury information filed against her stepfather listed Mary Sontz as a state witness. Mary Sontz and brother, Al Multach, retained counsel to prosecute their stepfather in the perjury prosecution. Counsel for appellant contend that the sole purpose of the perjury prosecution is to obtain a conviction so as to place the stepfather at a disadvantage in pending litigation between the stepchildren and the stepfather. Section 90.07, F.S.A., provides that a conviction for perjury shall make incompetent any person to testify in any court in this State, even if such person has been pardoned.
Count 1 of the information charged that Leo J. Rader swore falsely in substance and that the false testimony was material in a trover suit tried in the Circuit Court of Palm Beach County, Florida. Rader falsely swore in substance: "* * that he said to the officer of the First National Bank with whom he dealt when he signed the paper ordering certain bonds, photostatic copy of which paper had been introduced in evidence in said cause by Plaintiff and filed as Exhibit No. 3: `I want $10,000.00 worth of bonds.'"
Count 2: Leo J. Rader falsely swore in substance: "* * * that when he signed a certain order for $5,000.00 in bonds, photostatic copy of which order had been introduced in evidence in said cause by Plaintiff and filed as Exhibit No. 3, `there was nothing written on it, just the printing was there, the typewriting, whatever it was.'"
Count 3: Leo J. Rader falsely swore in substance: "* * * that he did not authorize the officer of First National Bank, with whom he dealt when he signed the paper ordering certain bonds, photostatic copy of which order had been introduced in evidence in said cause by Plaintiff and filed as Exhibit No. 3, to fill in on said paper $5,000.00 instead of $10,000.00, '"
Count 4: Leo J. Rader falsely swore in substance: "* * * that when he left the order, photostatic copy of which had been introduced in evidence by Plaintiff and filed as Exhibit No. 3 in said cause, with the officer of First National Bank, it was in blank,'"
Count 5: Leo J. Rader falsely swore in substance: "* * * that when he left the order with the officer of First National Bank, which photostatic copy of the order had been introduced in evidence by Plaintiff and filed as Exhibit No. 3 in said cause, he said, `I told Mr. Teed that I wanted $10,000.00 worth of bonds. In fact, we sat and talked about, I don't know, *108 maybe a half an hour, deciding what kind of bonds to get, and finally when I was ready to go he suggested this particular kind of bond, and then he says, `Here, you had better sign this as an order', which I did.'"
Count 6: Leo J. Rader falsely swore in substance: "* * * that on the occasion when he signed the order blank for the bonds that Bert Teed, President of the First National Bank at the time, gave him that paper to sign, photostatic copy of which paper had been introduced in evidence in said cause by Plaintiff and filed as Exhibit No. 3, and that he told the said Bert Teed that he wanted $10,000.00 worth of bonds and that he signed the said paper in blank  "
Count 7: Leo J. Rader falsely swore in substance: "* * * that when he left the order with the officer of First National Bank, photostatic copy of which order had been introduced in evidence by Plaintiff and filed as Exhibit No. 3 in said cause, there was nobody else in the room but the officer of the bank and himself  "
Count 8: Leo J. Rader falsely swore in substance: "* * * that the first time that he saw the order signed by Bessie Rader for $5,000.00 in bonds, photostatic copy of which order had been introduced in evidence by Plaintiff and filed as Exhibit No. 4 in said cause, was in the First National Bank when the deposition of Mr. Cameron was taken about two or three weeks ago,  "
Count 9: Leo J. Rader falsely swore in substance: "* * * that he never knew Bessie Rader placed the order for bonds which was signed Bessie Rader, which order had been introduced by Plaintiff and filed as Exhibit No. 4 in said cause,  "
Counsel for appellant point out that it was conceded by the parties that the $10,000.00 worth of Government bonds were paid for from the then existing joint bank account, during February 1944, of Leo J. Rader and Bessie Rader with the First National Bank of Palm Beach. The total amount of their joint account was insufficient by $1,325.00 to pay for the bonds. Leo J. Rader supplied the deficit of $1,325.00 and the bonds were sent to him and by Leo and Bessie Rader placed in their joint box at the bank, where they remained for a period of about two years, when they were used as collateral to secure a loan of $10,000.00 at the Bank of Pahokee in behalf of the nephew, L.W. Alper. The loan was renewed and the bonds were later sold at the direction of Leo J. Rader through a New York bank and credit for the $10,000.00 worth of bonds, plus interest, was placed to the credit of Leo J. Rader. The issues involved in the trover suit were, who were the owners of these bonds? Did they belong one-half to Leo J. Rader and the other half to Bessie Rader, his wife, or were they owned as an estate by the entireties?
In view of the issues involved in the civil suit, we have presented on this record the materiality, as a matter of law, of the allegations of perjury as charged in Counts 1 to 9, inclusive, of the information. In the case of Keir v. State, 152 Fla. 389, 11 So.2d 886, 888, on the question of the materiality of the alleged false testimony this Court said: "In order to sustain a conviction for perjury, not only must the substance of the alleged false testimony be proven; but it must also be proven that such testimony was material to the issue upon which the trial was had, that it was in fact false testimony, and that the accused knew of its falsity and wilfully and with deliberation swore to it as true. Miller v. State, 15 Fla. 577; 41 Am. Jur. 7; 48 C.J. 828. Moreover, the falsity of the material matter sworn to must be proved by the oaths of two witnesses, or by the oath of one witness and other independent and corroborating circumstances which are of equal weight with the testimony of another witness. Yarbrough v. State, 79 Fla. 256, 83 So. 873; Tindall v. State, 99 Fla. 1132, 128 So. 494."
The materiality of testimony assigned in prejury is a legal question for the courts to decide. Wharton's Criminal Evidence, Vol. 1 (11th Ed.), par. 371, pages 589-590:
"* * * The materiality of the testimony assigned in perjury is always a question of law, and not of fact; hence the *109 judge, and not the jury, is to pass upon the materiality of the testimony; but, like many other questions of law, it may become a mixed question both of law and of fact, in which case the court should admit it, limited by proper instructions. However, the materiality of the alleged false testimony cannot be proved by the mere opinion of witnesses; the witnesses are no more competent to prove correct conclusions in this respect than the jury trying the cause, and, for this reason, the opinion of witnesses as to the materiality of such testimony must always be excluded.
"It is the duty of the court to instruct the jury as to what facts constitute `material testimony.'"
It is our view and conclusion that the evidence charged as perjury and set out in each Count of the information from One to Nine, inclusive, supra, was not material to the issues in the trover case. It therefore follows that each of the nine judgments entered below must be reversed.
Reversed.
TERRELL, THOMAS, HOBSON and ROBERTS, JJ., concur.
SEBRING, C.J., and ADAMS, J., dissent.