Verne **RICHARDSON**,
**Defendant-Appellant,**

v.

**STATE of Indiana, Plaintiff-Appellee.**

**No. 1–1085A255.**

Court of Appeals of Indiana,
First District.

Aug. 20, 1986.

Rehearing Denied Oct. 20, 1986.

---

Scales, Wissner and Krantz, Boonville, for defendant-appellant.

Linley E. Pearson, Atty. Gen., John D. Shuman, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

NEAL, Judge.

## STATEMENT OF THE CASE

Defendant-appellant, Verne Richardson (Richardson), was convicted by a Pike Circuit Court jury of perjury. From a suspended sentence of two years, he appeals.

We affirm.

## STATEMENT OF THE FACTS

Richardson's argument is based on the facts, requiring us to set them forth in great detail. Richardson was charged by Information that he falsely testified in a deposition that he, accompanied by William E. Hudson, II (Hudson), went to the home of Beryl Jane B. Crawford (Crawford) in Petersburg, Indiana, for the purpose of witnessing the execution of Crawford's will. The deposition was taken by Maxine Killion, a free-lance reporter and notary public, on August 13, 1980, in Pike County, Indiana. Killion identified the portion of the deposition containing the allegedly per-

jured testimony. The deposition reflected Richardson's testimony that he and Hudson drove from Washington, Indiana, to Petersburg where Crawford executed her will, which was then witnessed by him and Hudson.

The evidence shows that Richardson, a lawyer practicing in Washington, Daviess County, Indiana, was Crawford's lawyer. Crawford was old, her mentality was declining, and she was ill with terminal cancer. Richardson took care of her legal business and talked to her about once a week. Glenna Williams (Glenna) was Richardson's secretary and, through Richardson's intervention, became a confidante, clerk, and secretary for Crawford for which she was paid $10.00 per hour. Richardson wrote wills for Crawford in 1976 and 1977, as well as the 1978 will in dispute, which allegedly was forged. In each will Glenna received assets of approximately $300,000.00. The 1976 will was witnessed by Richardson and Don Selby, a bailiff in the Daviess Circuit Court. The 1977 will was witnessed by Martha Palmer and Dorothy Gray and the 1978 will was witnessed by Richardson and Hudson. Martha Palmer and Don Selby are now deceased. Dorothy Gray and Hudson denied witnessing the respective wills.

Though Crawford had two surviving sons, the allegedly forged will gave nearly half of the disposable estate to Glenna. The will, as shown by State's Exhibits 10, 10A, 10B, 10C and 10D, consisted of an envelope, a will cover, and pages one through three. Page two contained Crawford's signature at the bottom of the body of the will. This was followed by an attestation clause which commenced,

"Under Penalties for Perjury, we WILLIAM E. Verne Richardson HUDSON, II [hand printed], ~~ROSE M. ERWIN~~, [the name Rose M. Erwin was hand printed, scratched out, and the name Verne Richardson was written in above it]."

The attestation clause was followed by another purported signature of Crawford. The only material on page three was "Last

Will and Testament of Beryl Jane B. Crawford. Page 3.

> /s/ William E. Hudson, II
> Witness
>
> /s/ Verne Richardson
> Witness"

Hudson, also a lawyer, gave the principal testimony. He had offices adjacent to Richardson's in Washington. He first saw the purported will of Crawford in the spring of 1978. Glenna came to his office and asked him to sign it as a witness. Crawford was not there, but her purported signature was on the will. Upon being assured by Glenna that it was Crawford's signature, Hudson, though aware of the impropriety, signed as a witness. The will had a cover stapled on it and was as set out in State's Exhibits 10, 10A, 10B, 10C and 10D. Glenna also got Rose M. Erwin, a secretary in a Washington insurance office, to sign as a witness. Erwin frequently notarized things for Glenna. Erwin testified that as she was walking by Glenna's office, Glenna yelled at her and said she needed her signature. Erwin went in and was presented the document, which she started to sign, thinking it required notarization. Quickly, she realized that it did not need notarization, nor was it Glenna's signature, but it had Crawford's name on it. Erwin asked Glenna what she was doing, and Glenna laughed, put the will in a drawer, and said, "It's nothing."

About three or four months later, Hudson was asked to come to Richardson's office where he joined Richardson and Glenna. The will pages had been separated. Page three, containing the signature of the witnesses, was removed, and Glenna threw it in the wastepaper basket. A new page three was produced. Richardson scratched out Erwin's name in the attestation clause on page two, wrote in his own, and both he and Hudson signed the new page three as witnesses. Crawford, of course, was not there. This purported will bore the date of April 5, 1978. Crawford died in December 1978. Hudson stated that there was no trip to Petersburg to execute the will and Richardson's statement to the contrary was false.

Hudson was called to be deposed in the will contest action. He and Richardson met and discussed what to do and what to say. Since Hudson had never seen Crawford's home near Petersburg, they drove down and viewed it. Nevertheless, Hudson described the wrong house in his perjured testimony in the deposition. He later perjured himself before the federal grand jury. Eventually, Hudson was charged with and pleaded guilty to perjury in the Daviess Circuit Court.

Clark Mercer, a document examiner for the Indiana State Police, testified that, by comparing the multiple staple holes in the cover, page one, and page two, to the single staple holes in page three, the will had been taken apart and a new page three, the signature page, had been added. Additionally, the will cover contained an indented impression of Hudson's signature which failed to correspond with his signature on the page three signature page, thereby corroborating Hudson's testimony that he signed on two occasions.

In the August 13, 1980, deposition, Richardson attempted to explain the scratched out *Rose M. Erwin* printed name in the attestation clause. He said that Crawford had asked Glenna who was coming to witness the will with Richardson. Glenna told her, so Crawford had Glenna write Rose Erwin's name on the will so she would know who Erwin was when she got there. When he brought Hudson instead, Richardson scratched out Rose Erwin's name and inserted his own.

At trial Richardson testified that he sent the will to Crawford by mail, at which time Rose Erwin's name was not on it. At another point, he testified that Glenna placed Rose Erwin's name on the will. Richardson also testified that, though Crawford had had the will several days, she studied it before signing it. Finally, he attempted to explain Hudson's imprinted name on the will cover by the assertions that he always had will covers laying about on his desk and Hudson frequently signed

things on his desk. Therefore, one just happened to be under some document he was signing.

## ISSUES

Richardson presents three issues for review wherein he challenges:

I. Whether he made the statement in question under oath or affirmation.

II. Whether the state proved his guilt by the direct testimony of at least two witnesses, or by the testimony of one witness and corroborating facts and circumstances to support that witness' testimony.

III. Whether the court committed reversible error by overruling his Motion for Judgment on the Evidence. It appears that Richardson waived this error by presenting evidence.

## DISCUSSION AND DECISION

### ISSUE ONE: *Oath.*

Richardson argues that there was no evidence that Maxine Killion was a notary public at the time she took his deposition on August 13, 1980. The record reflects the following colloquy between the Deputy Prosecutor and Killion at the trial:

"Q. How does one become a Notary Public?

A. Well, uh, it's sort of a routine thing any more, a long time ago when I first became a notary you had to get the little slip from the Judge that you were a good citizen and you sent it into the State of Indiana and provided a bond and now, as I said, it's sort of an automatic renewal thing every year.

Q. Did you do that?

A. Yes, I did.

Q. And as a Notary Public do you have authority to administer oaths?

A. Yes, I do."

The witness then testified that she took a sworn deposition of Richardson, and explained the oath and deposition in general. The colloquy continued:

"Q. And did you administer an oath to Verne Richardson before you took the deposition?

A. Yes, I did."

Additionally, there is nothing in the record to reflect that any objection was made at the time the deposition was taken as to the qualification of the officers, as required by Ind.Rules of Procedure, Trial Rule 30(C). Generally, this amounts to a waiver of the question. Ind. Rules of Procedure, Trial Rule 32(D).

■ Prior to January 1, 1978, a notary received her commission only after her good moral character was certified by a circuit, superior or probate court judge. After that date, court certification is no longer required. *See* IND.CODE 33–16–2–1(b)(1976); 1977 Ind.Acts, P.L. 34, Sec. 2. Here the jury, from the testimony, could legitimately infer that Killion had been a notary public continuously from before 1977 and through 1980 to the date of the trial, January 21, 1985. We find no error.

### ISSUE II: *Corroborating Evidence.*

■ Except for the existence of irreconcilable or inconsistent statements given under oath, as provided in IND.CODE 35–44–2–1, it is well settled in Indiana that to warrant a conviction of perjury, the evidence must be no less than the direct and positive evidence of two witnesses, or one witness and corroborating facts and circumstances. There is no detailed rule prescribing the nature of the testimony of a single witness, and the corroboration may be furnished by circumstantial evidence. *Cassorla v. State* (1968), 251 Ind. 390, 241 N.E.2d 365; *Pendleton v. State* (1959), 239 Ind. 341, 156 N.E.2d 782; *Barrientos v. State* (1977), 173 Ind.App. 652, 365 N.E.2d 789.

Richardson concedes the existence of the direct evidence of one witness, namely Hudson, but he challenges the sufficiency of the corroborating evidence. We disagree.

The underlying issue is the forgery of Crawford's will. As a part thereof, the immediate question is whether Richardson falsely testified that he and Hudson traveled from Washington to Petersburg where Crawford properly executed her will, and that he and Hudson properly witnessed it. Hudson testified directly that they did not, but instead witnessed the will in Crawford's absence in Richardson's office. Hudson's testimony was corroborated by a number of separate and independent facts. Richardson admittedly wrote the will, which benefited his secretary enormously. Glenna acquired Erwin's signature on the first signing through artifice in Washington. The instrument on its face shows the alteration in the attestation clause, whereby Erwin's name was scratched out and Richardson's name was substituted. Hudson's impressed signature, and the multiple staplings showed two signings and a substituted signature page. Richardson denied more than one signing. Hudson denied the proper witnessing of the April 5, 1978 will; Dorothy Gray denied witnessing one of the previous wills vouched for by Richardson. Finally, there are Richardson's implausible accounts of how Rose Erwin's name became involved; how Hudson's impressed signature came to appear on the will cover; and how Crawford studied the will before signing it even though she had had it in her possession for several days.

In our opinion this corroborating, circumstantial evidence is sufficient.

For the above reasons, this cause is affirmed.

Judgment affirmed.

ROBERTSON, P.J., and RATLIFF, J., concur.